IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AMANDA ZATORSKI (née AMANDA RYAN) <br><br> Plaintiff, <br><br> v. <br><br> ST. LOUIS COUNTY, MISSOURI <br><br> and <br><br> VANESSA DURIS; <br><br> and <br><br> CAROLE BASKIN; <br><br> and <br><br> SPRING SCHMIDT; <br><br> and <br><br> SAM PAGE; <br><br> Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW, Plaintiff, Amanda Zatorski[1] ("Mandy Ryan" or "Plaintiff"), individually and for her Complaint against the Defendants states the following:

### INTRODUCTION

---

[1] At all times relevant to this action, Plaintiff's legal name was Amanda Ryan (and she was more familiarly known as "Mandy Ryan"). Subsequent to the events as alleged herein, Ms. Ryan was married and changed her legal name to Amanda Zatorski. As Plaintiff was known to Defendant and its employees as Mandy Ryan, at all times relevant hereto, Plaintiff will be referenced herein as Mandy Ryan and/or Plaintiff Ryan for purposes of clarity and convenience.

1

Plaintiff Mandy Ryan was employed in a senior management position by Defendant St. Louis County in its Department of Public Health's Animal Care and Control ("ACC") from December 16, 2019, until her termination on December 11, 2020. Prior to her hiring, ACC was in "chaos," as publicly admitted by Public Health Director Spring Schmidt, had a poor reputation with respect to animal care, was beset by scandal, and was the subject of frequent topic of public discussion and criticism, both from the media and citizenry. With respect to Ms. Ryan, at the time of her hiring, she was already well-known to and highly respected by the public, media, and the animal welfare community. In fact, Defendant St. Louis County itself heralded Ms. Ryan's hiring, her skills, and abilities through media interviews, press releases, and publicity.

However, while Ms. Ryan believed she was hired to bring order to the "chaos" and reform to ACC, she quickly learned that St. Louis County only wanted advocates to privatize ACC and when Plaintiff refused to toe the line for privatization, senior St. Louis County officials punished her and attempted to concoct false rationale for her termination. Defendants conduct included restricting Plaintiff's speech, threatening her job, stripping duties, extending her probation, concocting conflicts of interests, and ultimately causing Plaintiff's termination on December 11, 2020. Defendant Schmitt and Page, as the Director of the Department of Public Health and County Executive, respectively, exercised final policymaking authority for the County and either directed, approved, or ratified the retaliatory actions, suppression of speech, and termination of Plaintiff rendering St. Louis County liable under *Monell*.

Refusing to be intimidated into silence, Plaintiff engaged in protected First Amendment activity when she spoke and published on social media, as a private citizen, on matters of substantial public concern, including the County's proposed privatization of ACC and Ms. Ryan lost her job as a result.

## JURISDICTION AND VENUE

1. Jurisdiction is proper to this Court, pursuant to 28 U.S.C. §§ 1331 and 1343, which provides this Court with original jurisdiction over cases and controversies raising federal questions and claims.

2. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in St. Louis County, Missouri.

## PARTIES

8. Plaintiff Amanda P. Ryan ("Plaintiff" or "Mandy Ryan") is and was at all times relevant herein a citizen of the United States of America and was a resident of the State of Missouri and the County of St. Louis. Plaintiff served as Animal Population Manager for the St. Louis County Department of Public Health's Animal Care and Control Division ("ACC"), where she was the third-highest ranking supervisory official from December 16, 2019 through December 11, 2020.

9. Defendant St. Louis County, Missouri (hereinafter "St. Louis County") is body politic, municipal corporation and/or political subdivision of the State of Missouri, organized and existing pursuant to the Missouri Constitution and State Law. Defendant St. Louis County operates with authority over the St. Louis County Animal Shelter / Animal Care and Control ("ACC").

10. Defendant Vanessa Duris is and was at all times relevant hereto a citizen of the United States and was, at all relevant times hereto a citizen of the United States and a Director of ACC who was acting under color of law in her position with St. Louis County. She is sued in her individual capacity.

11. Defendant Carole Baskin is and was at all times relevant hereto a citizen of the United

States and was, at all relevant times hereto a citizen of the United States and the supervisor of Defendant Vanessa Duris at the Department of Public Health who was acting under color of law in her position with St. Louis County. She is sued in her individual capacity.

12. Defendant Spring Schmidt is and was at all times relevant hereto a citizen of the United States and was, at all relevant times hereto a citizen of the United States and a Director of the Department of Public Health or supervisory staff member who was acting under color of law in her position with St. Louis County. She is sued in her individual capacity.

13. Defendant Dr. Sam Page is and was at all times relevant hereto a citizen of the United States and was, at all relevant times, the County Executive of St. Louis County, acting under color of law, as the final policymaker for the County, for which he is sued in his official capacity and acted under color of law, as well as being sued his individual capacity.

## ALLEGATIONS COMMON TO ALL COUNTS

14. Plaintiff began her employment with St. Louis County Animal Care and Control ("ACC") on December 16, 2019, as the Animal Population Manager. She was one of the highest-ranking managers in the division.

15. Prior to her hiring, Ms. Ryan was well-known to, and highly regarded by, St. Louis County's animal welfare community, as founder of Missouri K9 Friends, a prominent, local, not-for-profit animal rescue; as a dedicated advocate for animal welfare issues; for her frequent media appearances advocating for animal rescue and welfare; and as a highly skilled dog trainer operating her own training business.

16. In hiring Ms. Ryan, Defendant St. Louis County took steps to ensure that her hiring was

4

highly publicized in the St. Louis area, scheduling her for multiple local television interviews to promote her and her employment with ACC[2].

17. Upon information and belief, Defendant St. Louis County's hiring and media promotion of Ms. Ryan and her employment with ACC were designed to improve ACC's terrible reputation, which was beset by scandal and the termination of prior directors[3], a well as to reduce the levels of vocal public criticism and controversy surrounding ACC.

18. During her tenure at ACC, Ms. Ryan was well-respected and well-regarded by the majority of her subordinates.

19. During her tenure at ACC, Ms. Ryan was successful in her position, including reducing the shelter population through increased adoptions, improving animal care, and reducing the levels of "chaos" at the pound through positive leadership, management, and accountability.

20. Ms. Ryan's success in her position can be objectively documented through ACC statistics, including but not limited to statistics showing fewer animals housed in the pound and an increase in animal adoptions.

21. Unknown to Plaintiff at the time of her hiring, St. Louis County officials, including Defendants were developing plans to privatize ACC operations through a Request for Proposal (RFP) at the time of Plaintiff's hiring.

22. Plaintiff, as both a County resident and animal-welfare advocate, opposed privatization

---

[2] 'I'm ready to jump on board' | New hire hopes to bring change to St. Louis County Animal Control https://www.ksdk.com/article/news/new-hire-hopes-to-bring-change-to-stl-county-animal-control/63-ce135f6c-14ef-4759-9637-f35ad32c14db
St. Louis County ushers in changes at animal shelter | West County News |https://www.westnewsmagazine.com/news/st-louis-county-ushers-in-changes-at-animal-shelter/article_d11d806c-ffb3-5366-af77-f7bca1f39094.html
[3]*Is St. Louis County Ready to Give Up Its Problem Animal Shelter? Riverfront Times,* 10/9/19 https://drive.google.com/file/d/1xqckZp83b7c4_l-P4Sbjn2Sg3xzKNuvq/view?usp=share_link

and believed it would harm animals, reduce transparency, and undermine public confidence.

23. On or about January 21, 2020, Defendant Baskin, together with Defendant Schmidt, stated during a supervisory meeting that ACC leadership was expected to publicly support privatization because "political commitments had been made." They further suggested that employees' positions and duties could be improved or altered if they aligned publicly with the effort to privatize.

24. During this aforementioned meeting, Defendants Director Schmidt and Baskin informed Ms. Ryan that they would be willing to consider changing her job title and description to ensure that she kept her position in the event that the pound was privatized.

25. Ms. Ryan understood this to represent an offer of a quid pro quo in the form of a new title, position, and possible promotion if she were willing to publicly support the privatization plan and encourage her friends in the animal welfare and not-for-profit rescue communities to do the same.

26. Plaintiff refused to mislead the public or rescue organizations and declined to publicly support privatization.

27. In approximately late-January 2020 to early-February 2020, Ms. Ryan sought the opinion and advice of Mr. Jackson, her immediate supervisor, about her speaking at a St. Louis County Council meeting, as a taxpayer and resident, regarding her opposition to the potential privatization of ACC.

28. Mr. Jackson responded that Ms. Ryan needed to be aware that Director Spring Schmidt did not approve of employees speaking to the St. Louis County Council, the public, and/or the media, and had previously made threats against such employees about their continued employment if they did so.

29. On or about February 18, 2020, Plaintiff addressed the St. Louis County Council during an open public session. She spoke as a private citizen and raised concerns about the potential harmful effects of the planned privatization. Plaintiff's remarks were widely publicized and circulated internally within County leadership.

30. Within days, Defendant Duris, the Director of ACC, summoned Plaintiff to a meeting and warned her about her comments at the meeting, warned her to "stop rocking the boat," and reminded her that she was on probation and could be fired at any time. This threat was a result of Plaintiff's protected public speech.

31. On or about February 19, 2020, an executive aide from St. Louis County Councilmember Mark Harder's office requested a meeting and met with Ryan at the ACC offices to discuss the privatization of ACC and her and other staff's concerns regarding the operations of ACC and its potential privatization.

32. Within just a few days after Ms. Ryan had spoken before the St. Louis County Council and to Councilmember Harder's aide, ACC Director Duris summoned Ms. Ryan into a private meeting.

33. During this meeting, ACC Director Duris instructed Ms. Ryan that she needed to "stop rocking the boat" and to stop criticizing the Department of Public Health's effort to privatize ACC.

34. During this meeting, ACC Director Duris reminded Ms. Ryan that she was still in her probationary period and could be terminated at any time.

35. Ms. Ryan understood ACC Director Duris' statements to be a warning and direct threat against her and her employment if she were to again speak publicly or to the St. Louis County regarding ACC operations or her opposition to privatization of the pound.

36. In subsequent meetings, ACC Director Duris and/or Mr. Jackson warned Ms. Ryan, on

multiple occasions, that she should not the email St. Louis County Executive Sam Page regarding any concerns about ACC and/or its operations or else she would be "in trouble," or words to that effect, with DPH Co-Director Spring Schmidt.

37. Defendants Duris, Baskin, and Schmidt then instructed Plaintiff that she was prohibited from communicating with animal-rescue organizations, members of the media, or the public about ACC operations. They told her to "stay in her lane" and to cease criticizing the Department of Public Health. These directives were viewpoint-based restrictions designed to silence her protected speech.

38. After Plaintiff's speech before the St. Louis County Council and Dr. Sam Page, the retaliation escalated.

39. Plaintiff was excluded from meetings, deprived of essential duties, humiliated in front of peers, and had her probationary period extended without justification.

40. On June 2, 2020, Christopher Ave, the media spokesperson for the St. Louis County Department of Public Health emailed a copy of "conditions" for Mandy Ryan's continued employment, which included restrictions on her public conduct, social media and public comments.

41. On June 4, 2020 Defendant Baskin informed Mandy Ryan that the conditions for her continued employment including restrictions on social media and public comment had come directly from the county lawyers, stating, "This originated from our legal department."

42. This requirement broadly and unnecessarily restricted Plaintiff's speech, including citizen speech on matters of public concern including privatization.

43. Upon information and belief, this public comment "condition" for continued employment

8

were actually drafted by the St. Louis County Counselor's office after discussions with Defendant Page and/or his representatives in the St. Louis County Executive's office.

44. On December 11, 2020, Plaintiff was terminated from her position. Defendants Duris, Baskin, Page, and Schmidt coordinated and influenced this decision. The termination was retaliatory, lacked legitimate cause, and followed months of escalating hostility connected to Plaintiff's protected speech.

45. Upon information and belief, all defendants including Defendant Schmitt and Defendant Page were upset by Plaintiff's speech before the St. Louis County Council and her statements on social media opposing privatization.

46. While the privatization initiative was tabled during Ryan's employment and after her opposition, upon information and belief, defendants intended to attempt privatization again after Plaintiff's termination.

47. Ultimately, after Plaintiff's termination, the shelter's numbers grew immediately worse and after an exit of staff which ultimately resulted in privatization of ACC after Plaintiff was terminated.

48. Upon information and belief, Defendants Schmitt and Page directed, as final policy makers, approved of and/or ratified the retaliatory actions, attempts to restrict Plaintiff's speech, "condition" her employment and ultimately the probation and firing of Plaintiff.

49. As the final policymakers for St. Louis County, Defendant Schmitt and Page's actions and/or ratification of the retaliation, probation and firing of Plaintiff constitute St. Louis County policy.

50. During Ryan's employment, the St. Louis County Counselor's office hired a "friend" of

Defendant Page (according to the Mandi Nieland email, infra) to act as an "RFP consultant" to assist in drafting St. Louis County's Request for Proposal and effectuate privatization of ACC.

51. On January 29, 2020, Mandi Nieland, representative of *Best Friends* Animal Shelter, emailed Spring Schmidt, Carole Baskin, Rebecca Smail, Vanesa Duris, and Mandy Ryan indicating her knowledge that the RFP consultant, hired by the County Counselor's office, was discussing the contents or potential contents of the RFP with potential bidders.

52. Defendant Spring Schmidt promptly replied to the Nieland email (excluding Nieland herself) and ordered St. Louis County employees in receipt of the Nieland email, including Plaintiff, not to respond to the email under orders of the St. Louis County Counselor's office.

53. Defendant Schmidt later admitted she was "*alarmed"* by the Nieland email because "[w]e wouldn't talk to community partners relative to the contents of the RFP."

54. This Schmitt directive not to respond to the Nieland email evidences the County's intentional suppression of information and prohibition on transparency concerning ACC operations and the privatization process. It further reflects an official policy or practice to silence ACC staff, including Plaintiff, when outside entities raise concerns about RFP irregularities.

55. The Nieland email also reported that the RFP consultant was hired by Defendant Page as a consultant to support Spring [Schmitt] during the RFP and bidding process. The Nieland email stated the RFP consultant, Pam Walker, told her that Ms. Walker had agreed to draft the RFP as a "favor to Sam [Page]" and was only being paid a small stipend far below her normal rate.

56. Upon information and belief, Defendant Page was politically invested in ACC privatization and was upset with Plaintiff Ryan for speaking publicly against privatization.

57. In May 2020, Defendants extended Plaintiff's probationary period despite positive

performance evaluations from her direct supervisor. Plaintiff was told that she could be removed from probation earlier if she would "play nice" with ACC staff who opposed her efforts to speak publicly against privatization. The probation extension served as an adverse action motivated by retaliation against and to have leverage over Plaintiff's past and future protected speech.

58. Upon information and belief, in the weeks prior to Plaintiff's termination, Defendants Duris, Baskin, Schmidt, and Page prepared for the "fallout" that they expected would follow the planned termination of Plaintiff.

59. Upon information and belief, Dr. Sam Page either ordered or ratified the termination of Plaintiff Mandy Ryan.

60. Following the termination of Plaintiff, the St. Louis County Council received numerous complaints alleging that Plaintiff's firing was misguided, retaliatory, and politically motivated.

61. Defendants' actions would chill a person of ordinary firmness from speaking further on matters of public concern.

62. Plaintiff's protected speech was a substantial and motivating factor in the retaliation she suffered, her being placed on probation, and ultimately terminated.

63. The reasons offered for Plaintiff's discipline and termination were false, shifting, or inconsistent with reality and served as pretext for unlawful retaliation.

64. As a result of Plaintiff's termination, there was a large exodus of staff from ACC as well as an ACC-wide meeting attempting to retain staff; County Executive Dr. Same Page's office was flooded with complaints from people in the animal rescue community alleging corruption and political retaliation due to the significant improvements made at ACC while Plaintiff was employed there (including making the shelter a "no-kill" shelter for the first time in many years). Following Plaintiff's termination, the shelter numbers at ACC once again became extremely poor.

65. As evidenced by the complaints received, Plaintiff was nearly universally well-liked among her colleagues and members of the community.

66. Plaintiff suffered termination, and other constitutional injuries as a direct result of Defendants' unconstitutional conduct.

**COUNT I**
**FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)**
*Against Defendants Duris, Baskin, Schmidt, and Page*

67. Plaintiff incorporates all of the proceedings paragraphs as though fully set forth herein.

68. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the First Amendment, made applicable to the States through the Fourteenth Amendment

69. Plaintiff engaged in protected speech when she addressed the County Council as a private citizen, when she communicated with public officials about ACC operations, and when she internally reported mismanagement, legal violations, corruption, and abuse of authority.

70. Plaintiff's speech involved matters of public concern, including government transparency, misuse of public authority, privatization of public services, and proper care of impounded animals.

71. Defendants Duris, Baskin, Schmidt, and Page knew of Plaintiff's protected speech and responded with hostility, coercion, threats, restrictions, and ultimately termination.

72. Defendants' conduct would chill a person of ordinary firmness from continuing to engage in protected speech.

73. Plaintiff's protected speech was a substantial or motivating factor in the adverse actions taken against her.

74. Defendants acted intentionally, willfully, and with reckless disregard for Plaintiff's constitutional rights.

75. As a result, Plaintiff suffered lost wages, emotional distress, reputational harm, and other

compensable injuries.

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgement in their favor and against Defendants Duris, Baskin, Schmitt and Page; award her compensatory and punitive damages against the individual defendants for the violation of Plaintiff's constitutional rights; award her reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; grant pre and post-judgment interest; and grant any and all such other relief as this Court deems just and proper.

## COUNT II
### UNCONSTITUTIONAL POLICY OR CUSTOM ("*Monell liability*")
*Against St. Louis County*

76. Plaintiff incorporates all of the proceedings paragraphs as though fully set forth herein.

77. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the First Amendment, made applicable to the States through the Fourteenth Amendment.

78. Defendants Spring Schmitt, a Director of the St. Louis County Department of Health and Sam Page, as St. Louis County Executive, possess final policymaking authority over personnel decisions related to Plaintiff.

79. As Director of the Department of Public Health, Defendant Schmidt possessed and routinely exercised final authority over personnel matters within ACC, including the authority to approve, reject, or ratify disciplinary actions and termination decisions, and her decisions were not subject to meaningful review or only subject to review by the County Executive.

80. Even if ultimate authority resided in the County Executive, St. Louis County delegated to Defendant Schmidt final authority over employment decisions in the Department of Public Health, and Schmidt's approval or ratification of Plaintiff's termination therefore constitutes County policy under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) *City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988), and *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

81. Defendants Duris, Baskin, and Schmitt exercised delegated final authority over Plaintiff's employment, including authority to place her on probation and terminate her.

82. Plaintiff's termination on December 11, 2020 was the direct result of a decision made by the final policymaker Spring Schmitt and/or County Executive Sam Page.

83. Upon information and belief, Defendant Schmitt and/or County Executive Sam Page approved or ratified the retaliatory actions, including the termination of Plaintiff.

84. As such, these actions of approval or ratification constitute the official policy of St. Louis County.

85. Alternatively, the directives issued by Defendant St. Louis County or its employees prohibiting Plaintiff and other ACC staff from communicating with the County Council, elected officials, media, public, or nonprofit rescue organizations constituted an official policy or custom of St. Louis County. These directives were issued repeatedly from senior County officials with final or delegated policymaking authority.

86. Senior County officials expressly instructed Plaintiff and other ACC employees that they were required to publicly support ACC privatization and were prohibited from expressing disagreement with the initiative.

87. These speech restrictions were imposed because, as alleged, Defendant Director Spring Schmitt stated that "political commitments had been made," demonstrating that retaliatory restrictions on employee speech stemmed from County policy rather than isolated acts.

88. As a result of these unconstitutional policies, practices, and decisions, Plaintiff suffered the damages described above including the loss of her First Amendment rights.

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgement in her favor and against St. Louis County and award Plaintiff compensatory and punitive damages

for the violation of her constitutional rights and; award her reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; grant pre and post-judgment interest; and grant any and all such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all of the above issues, costs herein incurred, costs and fees where appropriate, payment of attorneys fees, and such relief as is deemed appropriate for the Court.

Dated:  December 11, 2025

Respectfully submitted,

Mark J. Pedroli, MBE 50787
***PEDROLI LAW, LLC***
7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314-789.7400 Fax

Mark@PedroliLaw.com